## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN BERKOWITZ, on behalf of herself and all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BARTON T., LTD., M&V LIVERY CORPORATION., and FAST OPERATING CORPORATION, all d/b/a as CARMEL CAR AND LIMO SERVICE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Susan Berkowitz ("Plaintiff" or "Berkowitz"), by and through her undersigned counsel, on behalf of herself and all others similarly situated, complaining of defendants Barton T., Ltd., M&V Livery Corporation, and Fast Operating Corporation, all d/b/a Carmel Car and Limo Service (collectively, "Defendants" or "Carmel"), alleges as follows:

## I.    PRELIMINARY STATEMENT

1.    Carmel operates prearranged transportation-for-hire in markets throughout the United States.  Its office is located at 2642 Broadway, New York, New York 10025, and one of its primary "featured markets" is the Tri-State Area (New York, New Jersey, and Connecticut).

2.    Carmel distinguishes itself from the competition by claiming that it does not rip customers off.  One of its commercials proclaims:  "A Person Should be Able to be Picked Up Without Being Ripped off." [1]

---

[1]  https://www.carmellimo.com/Media/commercial.shtml (at 12-16 seconds).

3.     As passengers of a livery service provider, Carmel passengers who specify their destinations and stops when arranging their trip are legally entitled to receive "accurate and binding" price quotes at the time of booking – when booked on the website or the app, this disclosure must be prominently disclosed in writing.[2]  As to tolls, Carmel passengers can only legally be charged the actual, incurred toll.[3]

4.     Despite the law and Carmel's proclamations of fairness to its passengers, Carmel passengers have a long history of being subjected to overcharge schemes.

5.     Carmel passengers are routinely subjected to three types of unfair and deceptive charges.  First, customers can be forced to pay the higher, cash price for tolls – even though drivers only incur the discounted E-ZPass rate (referred to herein as "overcharges").  Second, Carmel passengers are charged return tolls that are not disclosed until the end of the trip (referred to herein as "hidden charges").  Third, Carmel passengers get double billed when Carmel charges two passengers – a picked-up and a dropped-off passenger – for the same toll (referred to herein as "double charges").  These unfair practices are described in detail in Paragraphs 44-67, *infra.*

6.     Despite these entrenched practices, Carmel misleadingly advertises that, beyond the base fare, passengers will only be responsible for gratuity and tolls, if any – implying that passengers only have to pay tolls actually incurred as part of the passenger's trip.

7.     Carmel's advertising and car reservation process does not explain that toll charges can exceed the toll charges actually incurred by Carmel drivers due to E-ZPass/cash price disparities, does not disclose that passengers can be subjected to return tolls incurred by a driver

---

[2]  § 59B-23(b)(1-2); *see also* Paragraphs 44-46, *infra.*
[3]  § 59A-23(a)(3); *see also* Paragraphs 44-46, *infra.*

(even when there are no tolls incurred while the passenger is in the Carmel vehicle), and do not explain that Carmel's drivers can charge two customers for the same toll.

## II.    THE PARTIES

8.    Plaintiff is domiciled in New York County, New York, and brings this suit individually and in a representative capacity for those who are similarly situated.

9.    Defendants herein are:

A.    BARTON T., LTD. and/or BARTON TAXIS LTD. ("Barton") d/b/a CARMEL CAR AND LIMO SERVICE, upon information and belief a foreign limited company formed in the United Kingdom and upon information and belief with its primary members being citizens of the United Kingdom.

B.    M&V LIVERY CORP. ("MV Livery") d/b/a CARMEL CAR AND LIMO SERVICE, a domestic entity formed in the State of New York with its principal business address in the State of New York.

C.    FAST OPERATING CORP. d/b/a CARMEL CAR AND LIMO SERVICE ("Fast Operating Corp."), a domestic entity formed in New York and, upon information and belief, with its principal business address in Texas.

## III.    JURISDICTION AND VENUE

10.    This Court has original subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).

11.    The minimal diversity requirements of CAFA are satisfied.  28 U.S.C. § 1332(d)(2). Plaintiff seeks to represent all Carmel passengers nationwide who have been subjected to the unfair billing practices described herein.  Barton is, upon information and belief, a citizen of the United Kingdom.  MV Livery is a citizen of the State of New York and Fast Operating Corp. is a citizen of the States of New York and Texas.

12.     The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, satisfying CAFA's amount-in-controversy requirement.[4]

13.     Similarly, the CAFA numerosity requirement which requires that the aggregate number of class members is not less than 100 is satisfied, since Carmel is the largest limousine service in the world with 242 affiliated vehicles registered in New York alone.

14.     This Court has personal jurisdiction over Defendants, because Defendants (1) have availed themselves of New York laws (including obtaining a Taxi & Limousine Commission ("TLC") license number), (2) do substantial business in New York (such as listing the Tri-State Area, which includes New York, as one of its featured markets), and (3) have promoted, marketed, distributed, and sold transportation services in New York.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(2).  A substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district, since Carmel's regional office and For-Hire Livery Base ("Livery Base") are located at 2642 Broadway, New York, New York 10025.

## IV.    FACTUAL BACKGROUND

### A.    Carmel's Background

16.     Carmel holds itself out as a leading car and limousine service that complies with New York licensure requirements.  It differentiates itself from the competition by wooing

---

[4]  The math backs this up.  Carmel is the largest limousine service in the world, with more than 800 affiliated vehicles, 242 of which are registered in New York alone; statutory damages of $500 are available for each violation.  Conservatively accounting for *only* the 242 New-York-licensed vehicles, if each Carmel vehicle only committed 2 overcharge violations – charging the cash price on a single roundtrip through a toll – each month for the past three years, the amount in controversy, $8,712,000, would easily exceed the jurisdictional amount (3 years x 12 months x 2 violations each month x 242 cars x $500 penalty = $8,712,000).  Based on the well-documented history of rampant and consistent overcharges by Carmel, it is likely that each Carmel driver could be committing multiple overcharge violations *daily*.

customers with advertisements touting good prices and by implying that Carmel, unlike other car services, does not rip off its passengers.

17.    Carmel boasts that "[a]s of 2009, Carmel Car and Limousine Service proudly holds the title of being the largest limousine service in the world" and that it has an "affiliated fleet of over 800" vehicles.[5]

18.    Carmel posts its TLC license on the footer of all of its website pages:  "TLC License #B00256 A."[6]

### Carmel's Advertising Practices

19.    Carmel controls the information posted on its website and its app, including advertised base rates and toll costs.  For example, in a January 2019 email exchange with the TLC, Carmel's Chief Executive Officer ("CEO") told the TLC that he could change language on the Carmel website to fix certain statements the TLC identified as misleading; in a follow up email, he confirmed that the changes had been made pursuant to the TLC's directive.

20.    Carmel aggressively advertises to price-conscious customers, luring them to book Carmel cars for affordable prices.  For example, on its website, Carmel proclaims that "no one gives you a better price."[7]

21.    Carmel tells customers:  "We at Carmel believe that the services provided to our customers should not be rocket science.  Instead, we believe it should be simple – you call, we arrive on time, we take you comfortably and safely to your destination all for a very low price. That's it!!  Plain and simple."[8]

---

[5]  https://www.carmellimo.com/index.html
[6]  *See generally* https://www.carmellimo.com/
[7]  https://www.carmellimo.com/
[8]  https://www.carmellimo.com/General/AboutUs.shtml

22.     A screenshot of one of its commercials – espousing Carmel's professed belief that passengers should not be ripped off – posted on its website as a "Commercial of the week" – is shown below:[9]



23.     In addition to its general advertising campaign promising fair treatment and rock-bottom prices, Carmel also advertises specific costs on a designated "Rates" page of its website and elsewhere.

24.     As shown below, near the top of the "Rates" page, it says:  "No one beats Carmel prices since 1978."  The page then advertises specific airport rates and lists specific rates at the time of booking; however, except in the case of "all inclusive fare" bookings, the base rate does not include tolls or gratuities.  The page urges passengers to compare Carmel's rates to "see how much more you save with Carmel."

---

[9]  https://www.carmellimo.com/Media/commercial.shtml (at 12-16 seconds).



Carmel only addresses tolls at the very bottom of the page, in non-descript print reading: "Tolls and gratuities are not included."

25.    Customers regularly refer to the website and app for general information about Carmel, including its pricing.  Customers can book online, through the app, or over the phone. Regardless of the method of booking, customers are led to believe that they will only have to cover toll costs actually incurred.

26.    For instance, when customers go to book a reservation on Carmel's website, they are presented with a fee description that says "Toll (if any) and Tip are not included."  The parenthetical "if any" tells would-be customers and the public that tolls will not always be included and implies that customers will only be charged for tolls that are actually incurred during the course of a trip to (or in roundtrip scenarios, to and from) a given destination.  By extension, this notation tells customers that any additional toll amount owed will be the actual amount incurred (here, the lower E-ZPass rate), not the higher cash rate.  The website does <u>not</u> inform customers of possible

overcharges, hidden charges, or double charges.  Further, the website does <u>not</u> inform customers that certain toll charges are at the discretion of Carmel drivers.

27.    In fact, the only reference to return tolls, *i.e.*, hidden charges, on the website is buried in the FAQ page, which provides the following question and answer.  Question:  "What are the Tolls to the Airports?"  Answer:  "Not every trip to/from the airports will result in a toll.  If you are in Manhattan and there is a toll to/from JFK or LGA that toll will likely be $10.17, and tolls to/from EWR (Newark Airport) starts from $21.80.  Tolls for roundtrip reservations are charged each way.  There will be a charge if the driver must take a toll to return to the city.  The driver reserves the right to take the best route due to traffic/weather conditions."[10]  Yet, even if passengers manage to stumble across the airport toll FAQ, when it is read in conjunction with the notation that "[t]oll (if any) . . . [is] not included," it leads passengers to reasonably believe that while they may be responsible for return tolls for some airport trips, they would not be responsible for return tolls in other circumstances.

28.    The FAQ page does <u>not</u> state that tolls incurred for the return trip to the city will be charged on non-airport routes.  The below screenshot shows how the basic fare and fare descriptions are presented to customers who book online:

---

[10] https://www.carmellimo.com/General/Faq.shtml



29. Similarly, when customers book a reservation through the Carmel app, the "Vehicles, Rates & Payment" page presents different vehicle options with a large, bolded cost for each option, accompanied by a large, blue "BOOK" button.



30.    By contrast, as shown above, the app states in non-descript print, "Tolls and gratuities are not included[.]"    However, this booking page does <u>not</u> disclose the risk of overcharges, hidden charges, or double charges.    It does not disclose any information about passengers being responsible for return tolls under any circumstance, even for airport trips.

31.    All these advertisements and marketing materials are disseminated to the general public and published on the Carmel website.  These misleading statements target would-be passengers seeking livery transportation in the Tri-State Area and beyond.

## Carmel Controls Its Drivers

32.    Carmel sets all base fares for drivers in its fleet.[11]

33.    Carmel prohibits its drivers from charging late fees if the passenger is 15 minutes late or less.[12]

34.    Carmel fixes the charges for any passenger that is more than 15 minutes late; in such circumstances, the late passenger is charged based on a pro-rated, hourly rate depending on car class.[13]

35.    Carmel prohibits its drivers from charging extra for luggage so long as it fits in the trunk.[14]

36.    Carmel fixes the charge for luggage that does not fit in the trunk at $10.[15]

37.    Upon information and belief, Carmel requires drivers in its affiliated fleet to have Carmel logos on their vehicles, such as the ones shown in Carmel's commercial below:

---

[11]  https://www.carmellimo.com/General/Rates.shtml
[12]  https://www.carmellimo.com/General/Faq.shtml
[13]  https://www.carmellimo.com/General/Faq.shtml
[14]  https://www.carmellimo.com/General/Faq.shtml ("There is NO charge for luggage as long as it all fits into the trunk…").
[15]  https://www.carmellimo.com/General/Faq.shtml ("[I]f any piece of luggage does not fit into the trunk of the car and must be placed inside the vehicle, there will be a $10 surcharge").



38.    Carmel requires drivers in its affiliated fleet to install and use its Driver Smartphone app to keep drivers connected with Carmel's dispatch system.[16]

39.    Carmel requires drivers in its affiliated fleet to maintain constant communication via cellular WAP systems and Metro-call beepers.[17]

40.    Carmel requires drivers in its affiliated fleet to allow Carmel access to a driver's Global Positioning System ("GPS") tracking technology so that Carmel can track what routes are taken, including if the routes include a toll.

41.    Thanks to modern GPS technology and the Show Me My Car software program, Carmel tracks all of its drivers.  Carmel also dispatches its drivers to passengers, providing an additional way for Carmel to track the movements of its drivers.

42.    Thus, Carmel knows when its drivers incur a toll.

43.    Carmel selects, instructs, and supervises its affiliated drivers, including by making sure their vehicles comply with Carmel standards and instructing and supervising the drivers on what extra fees can be charged to customers (*e.g.*, luggage fees, late fees), and the amount of those fees.

---

[16] https://www.carmellimo.com/General/AboutUs.shtml
[17] https://www.carmellimo.com/General/AboutUs.shtml

**Carmel's Business & Unfair Toll Practices**

44.     Carmel is a licensed Livery Base from which its affiliated drivers are dispatched. A for-hire Livery Base is a business that dispatches livery vehicles on a prearranged basis and is also the physical location from which those vehicles are dispatched.[18]

45.     Each time a prospective passenger contacts a Livery Base like Carmel for transportation and specifies a destination and any intermediate stops, the Livery Base "must provide the prospective Passenger with an accurate and binding price quote for travel" "regardless of the means by which the passenger contacts the [Livery B]ase."[19]

46.     For non-phone reservations, the Livery Base must "prominently disclose *in writing* to the Passenger, *as the Passenger books the trip*, that the Passenger will receive *an accurate and binding price quote* for the trip upon entering his or her destination."[20]

47.     These rules make sense.  They allow passengers to know the trip cost in advance of booking or taking the trip.  They also allow passengers to compare the prices of alternative livery services.

48.     Carmel passengers contract directly with Carmel for Carmel to provide requested transportation at a specific base fare rate plus limited, additional fees set by Carmel and any gratuities.  Carmel bills and collects non-cash payments for certain Carmel car services; these charges appear as "CARMELLIMOPASS" on customer credit card statements.

49.     During the online booking process, Carmel tells customers that they will be responsible for "tolls (if any)."  During the app booking process, Carmel tells customers that the

---

[18]  https://www.nyc.gov/site/tlc/businesses/livery-base.page; §59A-03(e) (defining for-hire bases); https://www.nyc.gov/assets/tlc/downloads/pdf/B00256.pdf (a "base report" listing Carmel's TLC license number and designating it as a "livery" service).

[19]  § 59B-23(b)(1).

[20]  § 59B-23(b)(2) (emphasis added).

base rate does not include tolls or gratuity, but it does <u>not</u> provide any disclosure that passengers will be responsible for return tolls (*i.e.*, hidden charges) at the time of booking. Accordingly, Carmel assumes a duty to provide customers transportation to a destination in exchange for base fare plus tolls *if and only if* tolls are incurred enroute to the destination, and if incurred, the actual toll amount.

50. Carmel's promises regarding low prices, fair treatment, timeliness, comfort, and safety lure customers into booking with Carmel rather than its competitors, allowing Carmel to increase its passengers and profit.

51. Likewise, the language on Carmel's website, coupled with the TLC's prohibition on drivers charging a cash rate rather than the EZ-Pass rate drivers incur (as described in Paragraphs 59-63, *infra*), means that Carmel agrees via its contracts with customers that any charges beyond the basic fare are limited to tolls actually incurred.

52. Despite Carmel advertising that it does not rip off customers, Carmel's entrenched unfair practices continue to harm customers in three ways. First, when tolls are incurred, passengers are overcharged and forced to pay the cash rate rather than the E-ZPass rate actually paid by drivers.[21]

53. Second, passengers can be charged for tolls that were never disclosed – much less prominently disclosed – at the time of booking. In this circumstance, passengers are subject to hidden charges for return tolls that may be incurred after their trips. This is particularly unexpected for passengers whose driver did not take a toll route while transporting them to their destination, or for drivers who choose not to take a toll route on their return trip.

---

[21] E-ZPass regulations and practices are described in detail in Section IV.B., *infra.*

54.     Third, customers are double charged for certain tolls since drivers on airport trips can charge two passengers for the same toll, creating a windfall to Carmel drivers at the customer's expense.  For example, drivers who take a passenger to an airport and will incur a toll on the return trip, regularly charge the toll to both the passenger who was dropped off at the airport *and* to any passenger picked up at the airport.  In this way, Carmel drivers double charge the same toll on two different trips to the detriment of Carmel passengers.  Carmel claims it discourages its drivers from this practice, but it does not enforce a prohibition of the practice – even though it sets and limits other fares, fees, and surcharges (such as the luggage and waiting fees).

55.     The instances described above are not the only unfair or deceptive toll advertisement practices in which Carmel engages.  In January 2019, the TLC's prosecuting attorney directed Carmel's CEO to change the estimated toll prices listed on its website.  In that instance, Carmel estimated tolls of $19.70 for trips to and from Newark Airport, but admitted to the TLC that there were a variety of possible toll combinations for Newark trips, including $19.90 via the Holland Tunnel, $19.30 via the Lincoln Tunnel, and $20.75-$22.20 via the George Washington Bridge.

56.     Carmel admitted that the posted, estimated rate of $19.70 was not always the rate, but that instead it was a "judgment call."

57.     The TLC directed Carmel to provide a toll range "so that the tolls are accurately described."

58.     Carmel maintained that its displayed rate was not misrepresentative "since the final amount the passenger pays is clear to the passenger."  Nonetheless, pressed by the TLC, Carmel complied with the TLC's directive and updated the website information to include a toll range.

### B.    E-ZPass and Overcharges

59.    A car equipped with an E-ZPass transponder can use high-speed, cashless toll lanes. A toll is then charged to the account associated with the E-ZPass.

60.    All Carmel vehicles are for-hire vehicles that are legally required to participate in the E-ZPass New York Program.[22]  Additionally, Carmel requires its affiliated drivers to have E-ZPasses.

61.    Tolls paid with E-ZPass are lower than cash tolls.  The following bridge and tunnel tolls provide an illustrative example; as shown in the chart below, the current, standard, E-ZPass toll for the Cross Bay and Marine Parkway Bridges are $2.60, while the current cash rate is $5.60.[23] There are similar pricing disparities for other tolls.

### New Toll Rates at MTA Bridges and Tunnels - Implementation August 6th, 2023

Updated Aug 8, 2023

**Use the Tolls NY App to Easily Manage your E-ZPass or Tolls by Mail Account**

You can use the app to check your account balance, add funds, make payments, request E-ZPass Tags and adhesive strips, and more. More information can be found in the videos below.

**New Passenger Vehicle Rates**

One-Way Trip

| Crossing | E-ZPass (NYCSC) | Mid-Tier (NYCSC)* | Tolls by Mail / Non-NYCSC E-ZPass |
|---|---|---|---|
| Robert F. Kennedy, Bronx-Whitestone, Throgs Neck, and Verrazzano-Narrows Bridges and Queens Midtown and Hugh L. Carey Tunnels | $6.94 | $9.11 | $11.19 |
| Henry Hudson Bridge | $3.18 | $5.04 | $8.25 |
| Cross Bay and Marine Parkway Bridges | $2.60 | $4.11 | $5.60 |

---

[22]  "All For-Hire Vehicles must be equipped with a New York MTA Bridges & Tunnels EZ-Pass." § 59A-23 (a)(1); "EZ-Pass Account.  All For-Hire Vehicle Owners must participate in the EZ-Pass New York Program. . ." §59A-24(a).

[23]  https://new.mta.info/agency/bridges-and-tunnels/tolls-2023.  Similar preferential pricing for vehicles equipped with E-ZPass transponders has been standard practice for years.  As of March 22, 2015, the E-ZPass rate for the Cross Bay and Marine Parkway Bridges was $2.08, while the non-E-ZPass rate was $4.00.

62.    In New York, passengers must pay tolls incurred on their trips – *but only* the actual E-ZPass toll incurred.[24]

63.    It is illegal for any for-hire driver to charge a passenger more than the actual E-ZPass toll.[25]

64.    Despite Carmel advertising that customers are only required to pay tolls actually incurred, and despite Carmel drivers never incurring or paying tolls at the cash rate, Carmel passengers are routinely forced to pay the cash rate.

65.    Based on Carmel's misrepresentations regarding the cost of transportation, Carmel lures cost-conscious customers into entering agreements with Carmel, all with the understanding that they will only be charged for tolls actually incurred.

66.    Once Carmel customers enter into agreements with Carmel and are transported to their destination, Carmel-affiliated drivers shake down passengers for full cash toll rates and/or tolls not incurred as part of the trip.

67.    Although Carmel benefits from increased sales through its misleading advertising practices, when customers complain about the practice, Carmel disclaims responsibility for the overcharges, blaming its own affiliated drivers and insisting that it does not control what its drivers charge for tolls and fees since they are purportedly independent – even though Carmel controls all base fare pricing, luggage pricing, wait-time pricing, and requires its drivers to use Carmel's smartphone app and disclose their GPS location at all times.

### C.    Carmel's Long-Standing Knowledge of Unfair Toll Practices

68.    Carmel has long-standing knowledge of its unfair toll practices.

---

[24]  (3) Passengers must pay for the toll, but only must pay the actual amount (often a discounted toll) charged to the EZ-Pass § 59A-23(a)(3).
[25]  §59A-23(b)(3-5).

69.     Even before Carmel had its current, extensive technology to track its drivers, its unfair toll practices drew public criticism.

70.     In fact, in May 2015, Carmel was sued for charging the cash rate rather than the E-ZPass rate.[26]

71.     Subsequently, in 2017 Carmel launched its app, which tracks the routes drivers take. In a Carmel Press Release, Carmel's CEO, Dr. Avik Kabessa, boasted that the app also allows customers to provide feedback to Carmel about their experience, which is another source of Carmel's knowledge about consumer complaints regarding Carmel's toll practices described herein.[27]

72.     Carmel has also received – and responded to – complaints about toll practices on the Better Business Bureau and Yelp websites, including complaints on February 6, 2023, September 2, 2021, and May 27, 2021 on the Better Business Bureau website where Carmel has a D- rating.

73.     Other websites also document Carmel's entrenched unfair toll practices.  For example, on Yelp there are countless complaints about Carmel's toll practices; Carmel monitors and selectively responds to those complaints.  Select Yelp complaints about Carmel's toll practices include the following (copied verbatim, including typographical errors):[28]

- August 7, 2023 – "We had used careml for several yrs and our last 3 trips were horrible. we were almost in an accident in 2 cases and the driver never acknowledged our concern for their speed and safety.  In addition, we were charged for tolls when the driver took us on roads that did charge a toll. we called the car

---

[26]  *Gemelli v. Fast Operating Corp.*, Index No.: 651876/2015 (Supreme Court of N.Y., County of New York 2015) (discontinued without prejudice).
[27]  Exhibit 1, Carmel Press Release, Aug. 29, 2017.
[28]      https://www.yelp.com/biz/carmel-car-and-limousine-service-new-york-2?start=780      (the "Reviews" section can be sorted by date to show these complaints).

company and never received a follow up courtesy call We will NEVER use this service again".[29]

- February 20, 2022 – "Drivers impolite, demanding excessive amounts for toll (both directions) and 20% tip ( say it's mandatory and company policy, almost intimidating customers)."

- **February 22, 2020 – "Their prices are a rip off. They add toll charges that you don't use to increase their fees. When you do actually utilize tolls they use EZ Pass (which has discounted toll prices) but charge the rider higher toll amounts.. At least UBER is upfront with their charges!"**

- December 16, 2018 – "Every single ride the drivers and dispatch attempt to rob customers for additional fees. Pay for tolls that aren't taken, adding fees for things that weren't done. Even lying about tolls used. So done. Yellow cab is better – heck, walking is better."[30]

- December 13, 2018 – "I booked online for trip from Manhattan to EWR, and paid the base rate. Website clearly states that this charge does not include tolls and tip. Website does not state that toll charges are a totally made up number, and does not represent that actual cost of tolls incurred during trip. The actual tolls in my trip would have totaled less than $2.00; I was charged in excess of $19. Excuse given was that I was charged for tolls for return trip to NY – a wonderful way to double dip. Driver called company – they explained that this practice is accepted by the Taxi and Limousine Commission. Even if legal, company should have disclosed this practice – and detailed toll charges – on their website, before booking is complete.  Driver and car were excellent – but company is totally dishonest."

- September 30, 2015 – "Basically thieves. Ordered a car from EWR to my home in NJ. They quoted a low fare, but charged tolls to and from the city! Crazy! A taxi from the airport would have been much less. A car service that charges for tolls that aren't along the route is robbery."[31]

- March 17, 2015 – Why I won't be using Carmel again... It's one thing for Carmel drivers to make you pay a $7:50 toll to LGA or JFK when it only costs them $5:33 on their EZ Pass. But when I took my final Carmel trip from Manhattan to EWR, the driver first wanted to charge me $29 for tolls, then when this was pointed out to him, he said that was a mistake and the proper toll was $19. Considering that with his EZ Pass, the driver only paid a few dollars to get me to the airport (at 8pm) and the Carmel website says nothing about paying round trip tolls (and the fact that $19 is a rip-off), this is not "kosher". When I used to take Carmel to LGA or JFK, they never charged for round trip tolls. Their website should be clear if they are going to

---

[29] https://www.yelp.com/biz/carmel-car-and-limousine-service-new-york-2?start=20
[30] Carmel responded to this review.
[31] Carmel responded to this review.

(overcharge) the customer for a trip to EWR. All I can say is goodbye Carmel and hello Uber."

74.    There are toll complaints elsewhere online, including on Trip Advisor:  October 22, 2016 – "We booked a return journey from JFK to our Hotel in New York and prepaid it with Expedia.  When we arrived at the hotel we got told by the driver we had to pay $8 for toll charges we did pass a tool both but no money handed over, but this could be like a prepaid agreement they have.  On our return journey the taxi arrived on time and took us back to the airport we didn't go past any toll booths but the driver still said we had to pay $8 for toll charges. So just be careful of the extra charges."[32]

75.    In January 2019, Carmel indicated to the TLC that whether advertised toll amounts were misrepresentative hinged on whether "the final amount the passenger pays is clear to the passenger."  But as the above-described advertising and toll practices – and the complaints about them – show, the final amount the passenger pays for tolls is *not* clear to Carmel passengers.

## V.    CLASS ACTION ALLEGATIONS

76.    Plaintiff seeks to represent a class of all individuals nationwide who booked Carmel services – except those who paid an all-inclusive fare – who have been subjected to Carmel's unfair toll practices (overcharges, hidden charges, or double charges) at any time during the Class Period.[33]  These individuals fall into three sub-classes under the laws of the State of New York, defined as:

Overcharge Class:  All persons nationwide who hired and paid Carmel for transportation – except those who paid an all-inclusive fare – at any time during the Class Period and who

---

[32] https://www.tripadvisor.com/ShowUserReviews-g60763-d9587132-r430619695-Carmel_Car_Limousine_Service-New_York_City_New_York.html
[33]  The Class Period is defined as three years prior to the filing of this Complaint through the termination of this litigation.

were charged the full cash price for tolls incurred related to their trips, rather than the E-ZPass rates.[34]

<u>Hidden Charge Class</u>:    All persons nationwide who hired and paid Carmel for transportation – except those who paid an all-inclusive fare – at any time during the Class Period and who were charged for a return toll which was not disclosed at the time of booking.[35]

<u>Double Charge Class</u>:    All persons nationwide who hired and paid Carmel for transportation – except those who paid an all-inclusive fare – at any time during the Class Period and who were charged the full price of a return toll that was also charged to another passenger.[36]

These three subclasses are referred to as "the Classes" and their members are referred to as the "Class."

77.    Excluded from the Classes are Defendants, their affiliates, employees, agents, independent contractors, and officers and directors, as well as the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the definitions of the Classes based on discovery and further investigation.

78.    As explained in more detail below, Plaintiff seeks recovery for statutory damages, or in the alternative actual damages sustained, including loss of toll money or overpayment amounts.  Plaintiff also seeks attorneys' fees, court costs, litigation costs, and other damages.

79.    As explained in more detail below, Plaintiff and the Class sustained damages because of Defendants' conduct as alleged herein.  Plaintiff's claims are typical of the claims of the Classes since they all flow from allegations of the same unfair, deceptive business practices, the same false advertising, and the same (mis)representations and/or omissions.  Plaintiff, the

---

[34]  The Class Period is defined as three years prior to the filing of this Complaint through the termination of this litigation.

[35]  The Class Period is defined as three years prior to the filing of this Complaint through the termination of this litigation.

[36]  The Class Period is defined as three years prior to the filing of this Complaint through the termination of this litigation.

putative class representative herein, will fairly and adequately protect the interests of the Classes. Furthermore, Plaintiff is represented by skilled attorneys experienced in handling class litigation and who may be expected to handle this action in the best interests of the Classes.

80.    NUMEROSITY:[37]   The Class Members are so numerous that joinder of all members is impracticable.  While the exact number of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that possibly thousands of class members exist for each class.[38]

81.    COMMONALITY:[39]   There are questions of law and fact common to the Classes, including, but not limited to, determination of whether Defendants knew or should have known about overcharges, hidden charges, and double charges routinely being charged to customers, determination of whether for-hire vehicle passengers can legally be charged cash rates rather than E-ZPass rates; who is responsible for unfair toll practices (the driver, the Livery Base, or both); whether Carmel provides passengers with "accurate and binding" prices for trips at the time of booking; and determination of whether Carmel's advertisements and quoted prices are misleading.

82.    TYPICALITY:[40]   Plaintiff's claims are typical of those of the Classes.  Plaintiff's claims arise out of the same events, practices, and courses of conduct giving rise to the Class's claims.  Plaintiff's claims, like all Class claims, are based on the same legal theories, particularly

---

[37]  F.R.C.P. 23(a)(1).
[38]  Carmel is the largest limousine service in the world, with more than 800 affiliated vehicles, 242 of which are registered in New York alone.  As described above, Carmel has been misleading customers about toll charges and allowing its drivers to charge improper tolls for years.
[39]  F.R.C.P. 23(a)(2).
[40]  F.R.C.P. 23(a)(3).

legal theories related to unfair business practices, false advertising, negligent misrepresentation, common law fraud, and breach of contract.

83.    ADEQUACY OF REPRESENTATION:[41]  Plaintiff is an adequate representative for the Classes because, for example, she was reasonably misled by Carmel's advertisements and other public statements and as such overpaid for her transportation services.  Plaintiff is also an adequate representative because she has retained counsel competent and experienced in class action litigation, and Plaintiff and her attorneys intend to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

84.    ADDITIONAL INFORMATION:[42]  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to the individual members of the Classes which would establish incompatible standards of conduct by the parties opposing the Classes, and adjudication with respect to the individual members of the Classes would be dispositive of the interests of other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interests.  There are common questions of law and fact common to the Classes that predominate over questions involving individual members, making a class action the superior method of adjudication.

85.    Plaintiff will move for class certification in accordance with Federal Rule of Civil Procedure 23.

## VI.    PLAINTIFF-SPECIFIC ALLEGATIONS

86.    On May 3, 2023, Berkowitz booked Carmel car service.

---

[41] F.R.C.P. 23(a)(4).
[42] F.R.C.P. 23(b).

87.    As part of the reservation process, Berkowitz relied on prices listed on the Carmel website, **https://www.carmellimo.com/**, to determine cost and fare amounts prior to travel.

88.    That website explains that there is a base fare and that tolls (if any) and tip are not included.  Berkowitz reasonably interpreted that to mean that she would be responsible for any toll charges actually incurred during the course of her trip (*i.e.*, while she was in the vehicle being transported to her destination).

89.    On May 3, 2023, Berkowitz used Carmel to transport her from East 9th Street, New York, New York to Weehawken, New Jersey ("the May trip").  When the Carmel driver picked her up for the May trip, his vehicle was emblazoned with Carmel signage identifying it as part of the Carmel fleet.

90.    There are no outbound tolls from New York to New Jersey, and the route the Carmel driver took when driving Berkowitz that day did not have any tolls.  As a result, the driver did not incur any tolls in driving Berkowitz to her destination.

91.    Despite this, when they reached the destination, the driver demanded return fees for the tunnel toll and roadway/turnpike toll.  The cash rate for this toll was $17; the E-ZPass rate was $12.75.  This was the first time Carmel or the driver had notified her that she would be charged for a return toll.

92.    Berkowitz observed that there was an E-ZPass mounted on the windshield of the vehicle.

93.    However, not only did the driver demand return toll costs, he also demanded that Berkowitz pay the cash rate for his return tolls.  Specifically, (1) he demanded Berkowitz pay the return tolls despite not incurring any tolls during Berkowitz's trip, (2) he demanded Berkowitz pay for return tolls that were not disclosed at the time of booking, and (3) he demanded Berkowitz pay

for the return tolls immediately – regardless of whether he would have a passenger on his return trip who would also pay the tolls.

94.     When Berkowitz objected to these additional toll charges – pointing out that she had not caused the driver to incur any tolls and that even if she had he should not be able to charge more than the cost actually incurred – the Carmel driver became hostile and started screaming at her.  Berkowitz explained to him that she should not have to pay return tolls because he did not incur any tolls during the trip and the only tolls she had been informed that she would be responsible for were the tolls actually incurred during her trip.

95.     Ultimately, Berkowitz was forced to pay the overcharge (cash toll price), hidden charge (undisclosed return tolls), and potential double charge (driver paid twice for same toll) to the driver.

96.     After that, Berkowitz called Carmel, on its recorded line, to make a formal complaint.  Carmel denied responsibility.  Carmel did not issue her a refund for undisclosed tolls, and instead only issued a partial refund in the amount of the overcharge (the difference between the E-ZPass rate and the cash rate).

97.     Subsequently, on September 9, 2023, Berkowitz booked Carmel car service for a trip from East 9th Street, New York, New York to Newark Liberty International Airport the following day.

98.     Berkowitz paid the advertised base fare in advance via credit card on the Carmel website, **https://www.carmellimo.com/**.  Believing the overcharges and hidden charges during the May trip to be a one-time occurrence, Berkowitz again relied on the website's representation that she would be responsible for any tolls – but only tolls actually incurred during her trip.

99.     The base fare charge – $64.50 – appeared on her credit card statement as "CARMELLIMOPASS."

100.    On September 10, 2023, Berkowitz used Carmel to transport her and her husband to Newark Liberty International Airport ("the September trip").  When the Carmel driver arrived, his vehicle was emblazoned with Carmel signage identifying him as part of the Carmel fleet.

101.    Berkowitz also observed an E-ZPass mounted on the windshield.

102.    When they reached the airport, the driver demanded $23 for the return turnpike toll ($6) and tunnel tolls (the cash rate was $17; the E-ZPass rate was $12.75).

103.    Berkowitz objected to these additional toll charges because she had not been told about these toll charges when she booked her trip.  She pointed out that (1) she was being overcharged by paying the cash toll rather than the E-ZPass toll and (2) she was being charged regardless of whether the driver picked up another passenger, who would also be responsible for the same tolls, resulting in double charging.

104.    Berkowitz called Carmel for help.  The Carmel representative on the other end of the recorded line did not offer real-time help.

105.    Instead, the Carmel representative took notes and told Berkowitz she would receive a call back.

106.    Because Carmel refused real-time assistance, Berkowitz was once again forced to pay the overcharge and potential double charge of $23.00.

107.    The next day, Berkowitz finally connected with Charmaine at Carmel, also on a recorded line.

108.    On that call, Carmel disclaimed all responsibility, claiming that the Carmel Frequently Asked Questions allows drivers to charge these overcharges and double charges, even

though the FAQs do not include anything allowing for double charging via different customers, overcharging by using cash rates rather than costs-incurred, or for hidden charges, and even though the FAQs state that there will only be a return toll charge if the driver must incur a toll to return to the city. In reality, the return toll is charged at the cash rate regardless of whether the driver actually incurs a toll or picks up another passenger (and then double charges the toll).[43] Additionally, the toll information in the FAQ is not prominently disclosed to prospective passengers at the time of booking. Carmel did not issue any refunds related to the September trip.

109.    Berkowitz would not have booked the May trip or the September trip if she had known that she would be overcharged, subjected to hidden charges, and potentially double charged.

## VII.    CAUSES OF ACTION

### COUNT I

### (Deceptive Acts and Practices – N.Y. Gen. Bus. Law § 349)

110.    Plaintiff repeats and incorporates each and every allegation above as if fully set forth herein.

111.    New York General Business Law Section 349 ("GBL § 349") declares as unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ." The conduct of Defendants alleged herein constitutes recurring "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the Class seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendants, enjoining them from inaccurately describing, marketing, and advertising the toll charges.

---

[43]  https://www.carmellimo.com/General/Faq.shtml

112.    Defendants misleadingly, and inaccurately, communicate deceptive information to customers regarding their toll practices.

113.    Defendants' customer-oriented communications mislead customers in a material way in that they, *inter alia*, induce the Class to purchase and/or pay a premium for Defendants' for-hire car service when they otherwise would not have.  Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

114.    Plaintiff and the Class have been injured because they reasonably believed that they would be charged the toll costs actually incurred during their trip at the E-ZPass rate rather than the higher cash rate or for hidden charges or double charges.  Accordingly, Plaintiff and the Classes were induced to hire a car through Carmel but ultimately paid more than what they bargained for and/or reasonably expected.

115.    Plaintiff and the Class suffered actual damages amounting to the price difference between E-ZPass toll charges actually incurred and the higher cash price for those tolls, the price of return tolls that were not disclosed at the time of booking, and tolls that were double charged to two passengers, the exact amounts to be determined at trial.

116.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law § 349(a) and Plaintiff and the Class have been damaged by the practices since they prevent passengers from accurately comparing prices with competitors and causing passengers to hire Carmel car services when they otherwise would not have done so, resulting in increased profit for Carmel.

117.    As a result of Defendants' recurring "unlawful" deceptive acts and practices, Plaintiff and the Class are entitled to monetary, compensatory, statutory, and treble damages,

interest, and attorneys' fees and costs.  This includes statutory damages of $50 per violation pursuant to GBL § 349 and/or actual damages under GBL § 349.

## COUNT II

### (False Advertising – N.Y. Gen. Bus. Law § 350)

118.    Plaintiff repeats and incorporates each and every allegation above as if fully set forth herein.

119.    N.Y. Gen. Bus. Law § 350 prohibits false advertising "in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York.

120.    The statute also defines "false advertising" in pertinent part to mean advertising, including labeling, of a commodity.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal material facts in light of such representations with respect to the commodity to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.  N.Y. Gen. Bus. Law § 350(a).

121.    Defendants' advertisements contain misleading statements concerning the cost of tolls for which passengers are responsible in addition to stated fares.

122.    Defendants' advertising induced Plaintiff and the Class to hire Carmel car service.

123.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

124.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

125.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon customers at large.  Moreover, all passengers hiring Carmel's car services were, and continue to be, exposed to Defendants' material misrepresentations.

126.    Plaintiff and the Class have been injured because they were charged the cash rate for tolls rather than the E-ZPass rate actually incurred, despite advertisements stating that passengers would be responsible for tolls, *if any* – implying that passengers would only be responsible for tolls actually incurred – not overcharges providing a windfall for drivers.  Plaintiff and the Class were also damaged by being forced to pay hidden charges and double charges. Accordingly, Plaintiff and the Class were induced to hire Carmel's car service but ultimately paid more than what they bargained for and/or reasonably expected.

127.    Plaintiff and the Classes suffered actual damages amounting to the price difference between the tolls actually incurred and the higher cash tolls they were forced to pay, undisclosed return tolls (again at cash rates), and tolls double charged to separate passengers, the exact amounts to be determined at trial.

128.    As a result of Defendants' recurring, unlawful and false advertising practices, Plaintiff and the Class are entitled to statutory damages of $500 per violation pursuant to GBL § 350 and/or compensatory, actual damages and treble damages, together with interest, attorneys' fees, and costs.

### COUNT III

### (Common Law Fraud)

129.    Plaintiff repeats and incorporates each and every allegation above as if fully set forth herein.

130.    Under New York law, common law fraud "requires a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the

purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."[44]

131.    Here, Defendants' statements about additional tolls "if any" mispresent Defendants' actual practices, since Defendants' representations concerning tolls state that toll charges are limited to those actually incurred and/or since the statements omit clarifying language to capture the full extent of overcharges Carmel passengers are forced to pay.

132.    Carmel passengers relied on Defendants' statements about additional tolls and took those statements at face-value.    This was reasonable given both the nature of Carmel's (mis)representations and that charges for actually incurred E-ZPass tolls, not cash rates, have long been standard practice in the transportation industry and also a legal requirement in New York.

133.    This reliance caused Plaintiff and the Class to be damaged, including damage for toll overpayments (including overcharges for E-ZPass tolls, charges for tolls that were not properly disclosed, or that were paid to drivers twice).

134.    Carmel has actual knowledge of these toll practices, including from a prior lawsuit, and also from a long line of customer complaints, many of which were either made directly to Carmel or which Carmel is aware of because it responded to them.

## COUNT IV

### (Negligent Misrepresentation)

135.    Plaintiff repeats and incorporates each and every allegation above as if fully set forth herein.

---

[44] *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 81 N.Y.S.3d 816, 822, 106 N.E.3d 1176 (2018); *Pyskaty v. Wide World of Cars, LLC*, 15 Civ. 1600 (JCM), 2019 LEXIS 30006, at *39 (SDNY Fen. 25, 2019).

136.    Plaintiff and the Class entered contracts with Defendants for for-hire vehicle transportation, establishing privity between Class and Defendants.  As part of these contracts, Plaintiff and the Class booked through Carmel itself and (either directly or indirectly) paid Carmel base fare rates.

137.    As part of the booking process, Carmel provided misleading information or in the alternative withheld information about the improper toll charges passengers would be forced to pay.  Specifically, Carmel led customers to believe that additional toll charges would be the actual amounts incurred, while in reality Carmel passengers were forced to pay cash rate premiums and/or pay for hidden charges that were never disclosed or were forced to pay double charges for tolls that were also charged to another customer.

138.    As part of the booking process, Carmel's customers reasonably took Carmel's statements about pricing and tolls at face-value and relied on those statements in choosing to book with Carmel.  Plaintiff and the Class' reliance was reasonable given both the nature of Carmel's (mis)representations and that charges for actually incurred E-ZPass tolls, not cash rates, have long been standard practice in the transportation industry and also a legal requirement in New York.

### COUNT V

**(Breach of Contract)**

139.    Plaintiff repeats and incorporates each and every allegation above as if fully set forth herein.

140.    Plaintiff and the Class contractually agreed to pay tolls actually incurred during Carmel trips but did not agree to pay return tolls that were not disclosed, cash rates rather than E-ZPass rates actually incurred, or tolls paid in full by other passengers.

141.    However, Carmel breached its contractual obligations, including its obligation of good faith and fair dealing, resulting in Plaintiff and the Class paying toll amounts that were not

disclosed, amounts over-and-above the tolls actually incurred, or tolls paid in full by other passengers.

142.    As a result, Plaintiff and the Class have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Classes, demands judgment as follows:

A.    Certifying the Classes as requested herein, certifying Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as counsel for the Classes;

B.    Ordering that Defendants are financially responsible for notifying all members of the Classes of the alleged misrepresentations and omissions set forth herein;

C.    Awarding Plaintiff and the Class statutory damages or alternatively compensatory damages in an amount to be determined at trial;

D.    Awarding declaratory and injunctive relief, including:  enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful or unlawful;

E.    Ordering Defendants to stop overcharging for tolls and instead only charge for, or allow its drivers to charge for, the actual cost incurred;

F.    Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

G.    Awarding attorneys' fees, expenses, experts' fees, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and,

H.    Directing such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  April 10, 2024                          Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *J. Brandon Walker*
J. Brandon Walker
Lawrence P. Eagel
Marion C. Passmore
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone:  (212) 308-5858
Facsimile:  (212) 214-0506
walker@bespc.com
eagel@bespc.com
passmore@bespc.com

and

Casey C. DeReus
**BRAGAR EAGEL & SQUIRE, P.C.**
*[Pro Hac Vice to be filed]*
Post Office Box #830436
New Orleans, Louisiana 70185
Telephone:  (213) 612-7735
Facsimile:  (212) 214-0506
dereus@bespc.com